JOANOS, Judge.
Juhn appeals a final order of the Board of Architecture suspending his license to practice architecture for ten years, to be followed by two years probation, plus a $1,000.00 fine.
An administrative complaint was filed July 23, 1981, alleging in pertinent part that Juhn was guilty of negligence, misconduct, and failing to perform statutory and legal obligations in the practice of architecture in performing services regarding the Harbour Cay condominium project. A number of specific reasons for the charge were given, including that the architectural drawings did not conform with applicable codes, laws, and ordinances and did not assure the user against misunderstanding because they did not clearly and accurately indicate the design of structural elements and other essential parts of the work, and that Juhn failed to review the structural engineer’s work and coordinate architectural and structural drawings and specifications. The allegations were asserted to constitute cause for disciplinary action under Section 481.221(5), Florida Statutes (1979); several provisions of Section 481.225(1), Florida Statutes (1979); and Rules 21B-12-01(4)(a) and 21B-12.01(6)(f), Fla.Admin. Code.
Juhn elected to have a hearing pursuant to Section 120.57(1), Florida Statutes (1979), before a hearing officer appointed by the Division of Administrative Hearings. The hearing officer’s findings of fact in the recommended order included a detailed review of the events which lead to the filing of the administrative complaint. The findings indicated that Juhn had worked on numerous previous projects for Univel, the general contractor for the Harbour Cay project, involving some twenty high rise buildings, all but one of which had a basic structure of shear or load-bearing walls as opposed to “flat plate” slabs and supporting columns and the plans for each were similar. In this relationship Juhn prepared preliminary and final architectural drawings, but by agreement Univel, rather than Juhn, was responsible for hiring and supervising the other professionals needed for the project, such as structural engineers and mechanical and electrical subcontractors. Juhn furnished copies of his architectural plans and drawings to the structural engineer for preparation of structural drawings. Univel made any changes in the type of construction and informed Juhn and the other professionals. On the Harbour Cay project Juhn’s contract specifically excluded responsibility for structural, electrical, or mechanical engineering as well as inspection of construction or any involvement in *192 the construction, and conferences with persons other than representatives of Univel, but it provided Juhn would “cooperate with the engineers for the building.”
Based on the prior projects, Juhn assumed the method of structural support would be load-bearing masonry walls and masonry partitions, and drew his plans accordingly. Originally Univel intended to use this method of structural support but after soil testing, Univel determined the structure should consist of a “two-way” flat plate slab and reinforced concrete columns with no shear walls or masonry interior walls. The structural engineer, with whom Juhn frequently exchanged information, was advised of the changes, prepared structural drawings accordingly, and submitted them to Juhn for assembly with architectural plans, and mechanical and electrical drawings. Juhn prepared mechanical drawings although this was not within the scope of his agreement. Juhn became aware of the structural changes about the time the plans were completed, but did not see the need to change the architectural drawings since there would be no interference with firewalls, plumbing, and room arrangement, although he intended to incorporate the structural changes into the “as built” drawings. No revised drawings were ever received by the Cocoa Beach building department. The hearing officer further found while it is not unusual to make changes in plans as construction progresses, major changes in structural design known to the architect prior to submission of plans for a building permit should be incorporated into the basic architectural design.
A building official described the plans, which were approved subject to some changes due to discrepancies, as average, but in constructing the building, “you would have to know exactly what you were doing.” Permits issued and the basic structure was substantially completed when the building collapsed killing eleven people and injuring twenty-three. Juhn’s drawings and specifications were reviewed by an architectural consultant, who determined they were deficient and sub-standard in a number of respects, expressing the view that Juhn had provided little more than drafting services since he did not assume a leadership role in coordination of architectural design, and this failure was inconsistent with some of the terms of Juhn’s contract with Univel. After setting forth in detail the facts gathered from the hearing as to the specific deficiencies, the hearing officer found that ordinarily the designing architect serves as the design coordinator among the professionals involved, including structural, mechanical, and electrical engineers, and employs them or oversees their work and supervises construction to its conclusion, however, the architect’s services can be limited by contract and it is not uncommon for an architect to provide only architectural drawings, with the builder procuring engineering services and coordinating the overall result. In this case, Juhn contracted with the general contractor rather than the owner and limited his services to preparation of architectural drawings and the agreement to cooperate with the engineers. Univel hired the other professionals and coordinated the overall project. Juhn was not consulted regarding all of the changes. Ultimately the hearing officer found that although Juhn fulfilled his contract by cooperating with the various engineers, he did not fulfill the basic responsibility to conform his architectural drawings to known changes in the structural system which had been brought to his attention before submission of plans to city officials for a building permit.
The hearing officer concluded that with minor exceptions, Juhn’s work was accepted as adequate by permitting officials, and no questions were raised as to basic deficiencies or inconsistencies between architectural and structural drawings, however, Juhn’s documents did not comply with the statutory requirement to “clearly and accurately indicate the design of the structural elements and of all essential parts of the work to which they refer,”[1] because they did not reflect the basic structural design of the *193 building. Regardless of apparent lack of confusion by the builders due to construction of similar projects, the plans were not of the “sufficiently high standard” required by the statute. For this reason, the hearing officer concluded grounds for discipline had been shown under Sections 481.221(5) and 481.225(l)(e), and that the violation of Section 481.221(5) also supported a finding of misconduct in the practice of architecture under Section 481.225(l)(i).[2] In addition, Juhn had been negligent in the practice of architecture, as defined in Rule 12.01(4),[3] Fla.Admin.Code, and for that reason was subject to discipline under Section 481.-225(l)(i). The hearing officer noted that matters of structural significance and safety should not be left to the possibility of misinterpretation.
The hearing officer recommended that Juhn’s license be suspended for six months as a penalty, because the case involved simple negligence, there was no proof of intent to mislead or defraud, his shortcomings were primarily the result of a comfortable and apparently undemanding relationship with Univel over a period of time, the Department of Professional Regulation did not contend he was responsible for the collapse of the building, and he would probably never have been called before the Board but for the disaster.
The Board of Architecture, in the final order, stated that they adopted the hearing officer’s recommended findings of fact and conclusions of law, but rejected the recommended penalty as too lenient and instead suspended Juhn’s license for ten years, followed by two years of probation, plus a $1,000.00 fine.
On appeal, Juhn contends the Board acted improperly in rejecting or modifying the recommended findings of fact and increasing the penalty without complying with Section 120.57(l)(b)9; in rejecting or modifying conclusions of law even though stating in the order that they had been accepted; and in violating its own Rule 21B-11.-11, Fla.Admin.Code, by increasing the penalty with fewer than four affirmative votes.
Appellant argues that although the Board formally accepted the recommended findings of fact, several of the Board members’ comments at hearing indicated they actually rejected those findings, and did so without reviewing the complete record and stating with particularity in the order that the findings were not based on competent substantial evidence. Section 120.57(l)(b)9, Florida Statutes. Appellant refers specifically to statements made by Board members Rowe and Donofro.[4] We *194 disagree. We cannot say from reviewing the comments in the transcript of hearing that the Board did not accept the recommended findings of fact, as indicated in the final order. The facts as found by the hearing officer and accepted by the Board are supported by competent substantial evidence in the record and provide an adequate basis for the conclusions of law and the penalty imposed. Both the hearing officer and the Board appeared to focus on the failure to reflect, in the architectural drawings, major structural changes in the project as a foundation for the conclusion that appellant was subject to discipline under Subsections 481.225(l)(e), (i).
Appellant also argues the Board could not have complied with the requirement that it review the entire record before increasing the penalty, Section 120.-57(l)(b)9, because the Board only had access to certain exhibits for a brief period of time on the morning of the hearing. We cannot find that the Board’s review of the complete record, although brief, could not have been meaningful. There was a specific recess called in the proceedings in order to allow the Board to review those items. In addition, since the Board did not exceed its statutory authority in imposing the harsher penalty, see Section 481.225(3), we cannot find that there was substantive error regarding the severity of the penalty. Florida Real Estate Commission v. Webb, 367 So.2d 201 (Fla.1978).
In regard to Juhn’s argument that the Board failed to comply with its Rule 21B-ll.il, Fla.Admin.Code, by increasing the penalty based on a three-to-one vote, we note, initially, that Juhn did not raise this point in the proceedings being reviewed. See Sunland Hospital v. Garrett, 415 So.2d 783 (Fla. 1st DCA 1982). But aside from the apparent waiver, the agency’s deviation from its rule has been adequately explained pursuant to Section 120:-68(12)(b), Florida Statutes.
The order appealed is AFFIRMED.
SHIVERS and WENTWORTH, JJ., concur.

. Section 481.221(5) Florida Statutes.

. Section 481.221(5) provides:
Plans, drawings, specifications and other related documents prepared by a registered architect as part of his architectural practice shall be of a sufficiently high standard to assure the users thereof against misunderstanding of the requirements intended to be illustrated or described by them. To be of the required standard, such documents should clearly and accurately indicate the design of the structural elements and of all other essential parts of the work to which they refer.
Subsections 481.225(l)(e), (i) provide:
(1) The following acts constitute grounds for which the disciplinary actions in subsection (3) may be taken:

(e) Violation of any provision of s. 481.221;

(i) Upon proof that the licensee is guilty of fraud or deceit, or of negligence, incompetency, or misconduct, in the practice of architecture.

. Rule 21B-12.01(4) provides:
(4) An architect or firm may not be negligent in the practice of architecture. The term negligence is defined as the failure, by an architect, to exercise due care to conform to acceptable standards of architectural practice in such a manner as to be detrimental to a client or to the public at large.
(a) Plans, drawings, specifications and other related documents prepared by an architect shall be of a sufficiently high standard to inform the users thereof of the requirements intended to be illustrated or described by them. Such documents shall clearly and accurately indicate the design of all essential parts of the work to which they refer. An architect shall meet a standard of practice which demonstrates his knowledge and ability to assure the safety and welfare of his clients and the public.

. Rowe said:
We’ve already essentially accepted the Hearing Officer’s finding of fact and I just disa *194 gree with the penalty. Really without getting into a detailed explanation of some of the facts which frankly might indicate a disagreement in findings of law, might indicate my own opinion as to some disagreement there. I disagree with the penalty and accept the, as we’ve earlier moved, will accept the Hearing Officer’s findings of fact and conclusion of law ....
Donofro said, commenting on the recommended order:
There’s more here than sloppiness, and I wish that word hadn’t been used. There are services that are involved that the practitioner relinquished or didn’t do which within our practice he is obligated to do. He tried to contract them away and he tried to — by his drawings he tried to disregard them.
So, I think there’s more to it than just the graphics of his drawings and the sloppiness of the drawings ....